# 21-911

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

CHRISTOPHER T. SLATTERY, A NEW YORK RESIDENT, AND THE
EVERGREEN ASSOCIATION, INC., A NEW YORK NONPROFIT CORPORATION,
DOING BUSINESS AS EXPECTANT MOTHER CARE AND EMC FRONTLINE PREGNANCY
CENTERS,

*Plaintiffs-Appellants*,

– against –

ANDREW M. CUOMO, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE
STATE OF NEW YORK; ROBERTA REARDON, IN HER OFFICIAL CAPACITY AS THE
COMMISSIONER OF THE LABOR DEPARTMENT OF THE STATE OF NEW YORK; AND
LETITIA JAMES, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE
STATE OF NEW YORK,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

**BRIEF OF AMICUS CURIAE NEW YORK CIVIL LIBERTIES UNION IN
SUPPORT OF DEFENDANTS-APPELLEES AND IN SUPPORT OF
AFFIRMANCE**

*For continuation of Amici Appearance See Inside Cover*

NEW YORK CIVIL LIBERTIES
UNION FOUNDATION

By: GABRIELLA LARIOS
KATHARINE ES BODDE
ALLISON S. BOHM
ROBERT HODGSON
MOLLY K. BIKLEN
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300
glarios@nyclu.org

Dated: August 25, 2021

*Attorneys for Amici Curiae continued*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* New York Civil Liberties Union hereby certifies that it has no parent corporations and that no publicly held corporations own 10% of more of its stock.

**STATEMENT REGARDING CONSENT TO FILE AND COMPLIANCE WITH RULE 29(a)(4)(E)**

This brief is filed pursuant to Federal Rule of Appellate Procedure 29(a)(2) with the consent of all parties. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* certifies that no counsel for a party authored this brief in whole or in part, and no person other than *amicus*, its members, or its counsel contributed money that was intended to fund the preparation or submission of this brief.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

STATEMENT REGARDING CONSENT TO FILE AND COMPLIANCE WITH RULE 29(a)(4)(E) ........................................................................................... ii

INTRODUCTION ...............................................................................................1

STATEMENT OF INTEREST ...............................................................................2

ARGUMENT .....................................................................................................4

   I.    ALTHOUGH TITLE VII PROHIBITED SEX DISCRIMINATION NEARLY SIXTY YEARS AGO, LEGISLATURES HAVE BEEN FORCED TO CLARIFY REPEATEDLY THAT DISCRIMINATION BASED ON PREGNANCY, REPRODUCTIVE CAPACITY, AND REPRODUCTIVE DECISION MAKING IS PROHIBITED ...................4

   II.   EMPLOYEES CONTINUE TO FACE SERIOUS RISK OF WORKPLACE DISCRIMINATION BASED ON THEIR REPRODUCTIVE HEALTH DECISIONS .............................................10

CONCLUSION .................................................................................................15

# TABLE OF AUTHORITIES

*Cases* ......................................................................................... *Page(s)*

*Cargian v. Breitling USA, Inc.*, 737 F. App'x 41 (2d Cir. 2018)...............................3

*Cath. Charities of Diocese of Albany v. Serio*, 7 N.Y.3d 510 (2006).......................8

*DeJesus v. Fla. Cent. Credit Union*, No. 8:17-CV-2502-T-36TGW, 2018 WL 4931817, (M.D. Fla. Oct. 11, 2018)....................................................................13

*Erickson v. Bartell Drug Co.,* 141 F. Supp. 2d 1266, 1271 (W.D. Wash. 2001) ......7

*Evergreen Association, Inc. v. City of New York*, 740 F.3d 233 (2d Cir. 2014).......3

*Geduldig v. Aiello*, 417 U.S. 485 (1974)...................................................................5

*General Elec. Co. v. Gilbert*, 429 U.S. 125 (1976)...................................................5

*Hall v. Nalco Co.*, 534 F.3d 644 (7th Cir. 2008) ....................................................13

*In re Union Pacific Railroad Employment Practices Litigation*, 479 F.3d 936 (8th Cir. 2007) ...............................................................................................................7

*McGowan v. Ananas Day Spa et al.*, 2009 WL 3290324 (E.D.N.Y., January 6, 2009) ....................................................................................................................12

*McGowan v. Ananas Spa E.*, LLC, No. 09CV0040(JS)(WDW), 2009 WL 2883065 (E.D.N.Y. Sept. 2, 2009).....................................................................................9

*Reeves v. Swift Transp. Co.*, 446 F.3d 637 (6th Cir. 2006)......................................6

*Serednyj v. Beverly Healthcare LLC,* No. 2:08-CV-4 RM, 2010 WL 1568606, (N.D. Ind. Apr. 16, 2010) ....................................................................................6

*Shomo v. Junior Corp.*, No. 7:11-CV-508, 2012 WL 2401978 (W.D. Va. June 1, 2012) ....................................................................................................................12

*Spivey v. Beverly Enters.*, 196 F.3d 1309 (11th Cir. 1999)......................................6

*Urbano v. Continental Airlines*, 138 F.3d 204 (5th Cir. 1998)................................6

*Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012)............................................3

**Statutes and Regulations**

11 NYCRR § 52.16 ..................................................................................................14

29 C.F.R. § 1604.10 (1975) .......................................................................................4

42 U.S.C.A. § 2000e (West) ......................................................................................5

N.Y. Ins. Law § 4303 ...............................................................................................14

N.Y. Exec. Law § 296 ..................................................................... 1, 4, 6

N.Y. Ins. Law § 3221 .........................................................................8, 14

N.Y. Ins. Law § 3216 ............................................................................14

N.Y. Labor § 203-e ........................................................................ passim

*Enforcement Guidance on Pregnancy Discrimination and Related Issues*, EEOC-CVG-2015-1, 29 CFR 1604 ..................................................................9

Pregnancy Discrimination Act, Pub. L. No. 95-555, 92 Stat 2076 (1978)...............5

**Other Authorities**

155 Cong. Rec. S12,051 (daily ed. Dec. 1, 2009)....................................................8

2018 National Clinic Violence Survey (Feminist Majority Foundation 2019) ...... 14

A Better Balance, Long Overdue: It Is Time for the Federal Pregnant Workers Fairness Act, 14-16 (2019).........................................................................6

Cloe Axelson, *It's Time to End The Stigma Around Infertility. Our Newest Federal Judge Won't Help*, Dec. 11, 2019, WBUR, https://www.wbur.org/cognoscenti/2019/12/11/sarah-pitlyk-surrogacy-infertility-cloe-axelson ..............................................................14

Deborah A. Widiss, *Intimate Liberties and Antidiscrimination Law*, 97 B.U.L. Rev. 2083 (2017) .........................................................................11

Dr. Pragya Agarwal, *Infertility In the Workplace: Women Are Still Suffering In Silence*, Forbes, Mar. 8, 2020, https://www.forbes.com/sites/pragyaagarwaleurope/2020/03/08/infertility-in-the-workplace-women-are-still-suffering-in-silence/?sh=6e5c45762c30 .......... 14

Equal Employment Opportunities Comm'n, Comm'n Decision on Coverage of Contraception (2000) ......................................................................... 7

Jamie L. Clanton, Note, *Toward Eradicating Pregnancy Discrimination at Work: Interpreting the PDA to "Mean What It Says,"* 86 Iowa L. Rev. 703 (2001).......6

Jill Heaviside & Rosann Mariappuram, *The Escalation of Anti-Abortion Violence Ten Years After Dr. George Tiller's Murder*, Rewire, May 31, 2019, https://rewire.news/article/2019/05/31/the-escalation-of-anti-abortion-violence-ten-years-after-dr-george-tillers-murder/; Violence Statistics & History, Nat'l Abortion Fed., https://prochoice.org/education-and-advocacy/violence/violence-statistics-and-history/ .........................................................................13

Joan C. Williams, Written Testimony at EEOC Meeting on Unlawful Discrimination Against Pregnant Workers and Workers with Caregiving Responsibilities (Feb. 15, 2012) .........................................................11

Julia Turkewitz & Jack Healy, 3 *Are Dead in Colorado Springs Shootout at Planned Parenthood Center*, N.Y. Times, Nov. 27, 2015,

https://www.nytimes.com/2015/11/28/us/colorado-planned-parenthood-shooting.html..........................................................................................14

Kelli Thompson, *I Kept My IVF a Secret at Work Because of the Stigma Around Fertility Treatments*, Working Mother, Mar. 22, 2021, https://www.workingmother.com/how-employers-can-support-employees-with-infertility..........................................................................................14

N.Y. Assembly Debate on Assembly Bill No. 8769-A (June 18, 2014) ................10

Nicholas Pedriana, *Discrimination by Definition: The Historical and Legal Paths to the Pregnancy Discrimination Act of 1978*, 21 Yale J. of L. & Feminism 1 (2009) ....................................................................................................4

Patient Protection and Affordable Care Act, H.R. 3590, 111th Cong. (2009), *amended by,* Women's Health Amendment, S. Amdt. 2791 to S. Amdt. 2786 ....8

Richard Sandomir, *Ex-Mets Executive Sues Jeff Wilpon, Citing Discrimination Over Pregnancy*, N.Y. Times, Sept. 10, 2014, https://www.nytimes.com/2014/09/11/sports/baseball/former-executive-sues-mets-and-wilpon-for-discrimination.html..........................................................12

Stephanie Bornstein, *Poor, Pregnant, And Fired: Caregiver Discrimination Against Low-Wage Workers*, Center For Worklife Law, (2011), PoorPregnantAndFired.pdf (worklifelaw.org).....................................................11

Tami Luhby, *What does your employer know about your health*, CNN, Feb. 12, 2014, https://money.cnn.com/2014/02/12/news/economy/employer-health/index.html ..........................................................................................14

iv

## INTRODUCTION

Determining whether, when, and how to have children are decisions for individuals and their families, not their employers—and no employee should fear being penalized in the workplace because their employer disagrees with their personal reproductive health care choices. On January 22, 2019, the New York State Legislature passed N.Y. Labor Law Section 203-e to clarify and confirm that New York employers cannot discriminate "on the basis of [an] employee's or dependent's reproductive health decision making." Such decision making includes the choice to become pregnant, to continue a pregnancy, to prevent pregnancy, or to end a pregnancy, and Section 203-e made this protection explicit within the framework of existing prohibitions that prevent employment discrimination on the basis of characteristics like religion, race, sex, and sexual orientation. *See* N.Y. Exec. Law § 296(1).

Plaintiff-Appellant Evergreen Association, Inc., a private employer, seeks to enjoin enforcement of this antidiscrimination law, arguing in part that the law should be struck down because there was "no actual problem to be addressed" by the law's passage. Pls. Br. at 59. This assertion is false. The State Defendants persuasively establish New York's compelling interest in preventing discrimination. *See* Defs. Br. at 35-38. *Amicus* seeks to provide historical context—regarding the need for targeted statutes to root out certain forms of sex

1

discrimination and regarding the harms experienced by employees—to inform the Court's consideration of that interest.

In the face of overwhelming, longstanding, and routine workplace discrimination targeting sex, reproductive capacity, pregnancy, and reproductive decision making, a necessary patchwork of federal and state protections has developed. But with every new statutory clarification, some employers have continued to discriminate—against women, pregnant employees, or employees accessing certain reproductive health services—and have found ways to justify that discrimination as falling outside the scope of existing law. Section 203-e fills a gap by explicitly clarifying that prohibited discrimination includes the types of harm all too often experienced by employees penalized for making private medical decisions about their own reproductive health and futures, including those highlighted by the studies *amicus* provides in this brief. For these reasons, along with those articulated by the State Defendants, *amicus* urges this Court to affirm the district court's opinion.

## STATEMENT OF INTEREST

The New York Civil Liberties Union ("NYCLU") is the New York State affiliate of the American Civil Liberties Union, and a nonprofit, nonpartisan organization committed to the defense and protection of civil rights and civil liberties, with over 112,000 members across the State. The NYCLU has long

2

fought to protect and expand the civil liberties guaranteed to New Yorkers under state and federal law, including the rights of women and pregnant people[1] to due process, equality, and reproductive freedom under the law. The NYCLU has litigated and participated as *amicus curiae* before this Court in numerous sex discrimination cases, *see, e.g.*, *Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012) (direct counsel); *Cargian v. Breitling USA, Inc.*, 737 F. App'x 41 (2d Cir. 2018) (as *amicus*), as well as cases involving First Amendment challenges to laws protecting the rights of pregnant people, *see Evergreen Association, Inc. v. City of New York*, 740 F.3d 233 (2d Cir. 2014) (as *amicus*). *Amicus curiae* brings expertise in the relevant law and has a strong interest in ensuring the correct analysis and resolution of questions directly implicating gender equality and reproductive autonomy.

---

[1] Although this brief at times refers to women as a protected class targeted by the types of discrimination that *amicus* highlights, *amicus* recognizes that people of other gender identities—including transgender men, gender nonbinary people, and gender-diverse people—also become pregnant and encounter entrenched discrimination based on their reproductive capacity and decision making. Section 203-e protects people of all genders.

3

## ARGUMENT

I. **ALTHOUGH TITLE VII PROHIBITED SEX DISCRIMINATION NEARLY SIXTY YEARS AGO, LEGISLATURES HAVE BEEN FORCED TO CLARIFY REPEATEDLY THAT DISCRIMINATION BASED ON PREGNANCY, REPRODUCTIVE CAPACITY, AND REPRODUCTIVE DECISION MAKING IS PROHIBITED.**

Section 203-e is part of a long legacy of legislation aimed at clarifying the scope of antidiscrimination protections related to sex. Notwithstanding the passage of Title VII of the Civil Rights Act of 1964 and its New York analog, N.Y. Exec. Law §§ 292, 296, prohibiting employment discrimination based on sex, employers have persisted in discriminating based on pregnancy, reproductive capacity, and reproductive decision making. This history of discrimination has justified each successive, more specific legislative attempt to end it, including Section 203-e.

For the first 14 years after Title VII's passage, for example, employers continued to exclude pregnancy from the conditions covered under their health and nonoccupational disability insurance plans. *See generally* Nicholas Pedriana, *Discrimination by Definition: The Historical and Legal Paths to the Pregnancy Discrimination Act of 1978*, 21 Yale J. of L. & Feminism 1, 9, n.33 (2009) (collecting cases). While many employees took the position that such pregnancy-benefit exclusions constituted discrimination on the basis of sex, and indeed the Equal Employment Opportunity Commission ("EEOC") promulgated regulations interpreting Title VII to prohibit them, *see* 29 C.F.R. § 1604.10(b) (1975)

4

("[Benefits] should be applied to disability due to pregnancy or childbirth on the same terms and conditions as they are applied to other temporary disabilities."), ultimately employers were permitted under Title VII to continue excluding pregnancy from their employees' plans. In *General Elec. Co. v. Gilbert*, the Supreme Court held that Title VII allowed such exclusions because they "divide[] potential recipients into two groups[:] pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes." 429 U.S. 125, 135 (1976).[2]

Congress responded by passing the Pregnancy Discrimination Act ("PDA"). The PDA amended Title VII to make explicit that sex discrimination includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work." 42 U.S.C.A. § 2000e (West), Pregnancy Discrimination Act, Pub. L. No. 95-555, 92 Stat 2076 (1978).

---

[2] The Supreme Court similarly held that excluding pregnancy from disability coverage was not sex discrimination under the Equal Protection Clause. *See Geduldig v. Aiello*, 417 U.S. 485, 494, 96-97 (1974) ("California does not discriminate with respect to the persons or groups which are eligible for disability insurance protection under the program . . . There is no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not.").

Even with such explicit statutory language, workplace pregnancy discrimination persisted. Employers continued to push pregnant employees out of the workforce through failures to accommodate, justifying this practice by narrowly construing the PDA's requirement that they accommodate only those pregnant workers who are similar to their non-pregnant disabled peers "in their ability or inability to work." *Id.*; *see also Reeves v. Swift Transp. Co.*, 446 F.3d 637, 641 (6th Cir. 2006); *Spivey v. Beverly Enters.*, 196 F.3d 1309, 1312 (11th Cir. 1999); *Urbano v. Continental Airlines*, 138 F.3d 204, 208 (5th Cir. 1998); *Serednyj v. Beverly Healthcare LLC*, No. 2:08-CV-4 RM, 2010 WL 1568606, at *13 (N.D. Ind. Apr. 16, 2010) (relying on "a blind spot in the statutory scheme created by Congress" to uphold an employer's refusal to accommodate a pregnant employee), *aff'd*, 656 F.3d 540 (7th Cir. 2011); Jamie L. Clanton, Note, *Toward Eradicating Pregnancy Discrimination at Work: Interpreting the PDA to "Mean What It Says,"* 86 Iowa L. Rev. 703 (2001) (summarizing courts' interpretations); A Better Balance, *Long Overdue: It Is Time for the Federal Pregnant Workers Fairness Act*, 14-16 (2019) (describing a representative sample of more recent post-PDA cases where employers failed to accommodate pregnant workers).

In response, New York passed a Pregnant Workers Fairness Act in 2015, explicitly clarifying under New York law that pregnancy discrimination protections require workplace pregnancy accommodation. N.Y. Exec. Law §§ 292,

6

296. By passing the Pregnant Workers Fairness Act, New York addressed gaps in the protections offered by state and federal law that had failed to fully protect employees from discrimination.

As with pregnancy discrimination, the New York Legislature similarly stepped in to clarify the legal requirements for employers' coverage of contraception. For years, affected employees argued that because contraception is a means by which a person controls her ability to become pregnant employers' contraception coverage exclusions violated Title VII, and in 2000 the EEOC issued a Commission Ruling stating explicitly that Title VII's prohibition of sex discrimination requires employers to "cover the expenses of prescription contraception to the same extent, and on the same terms, that they cover the expenses of [other] drugs, devices, and preventative care . . . ." Equal Employment Opportunities Comm'n, Comm'n Decision on Coverage of Contraception (2000); *see also Erickson v. Bartell Drug Co.*, 141 F. Supp. 2d 1266, 1271 (W.D. Wash. 2001) (holding that contraception exclusion violated Title VII). But many employers championed a narrower view of the law's requirements and persisted in denying contraceptive coverage. *See, e.g.*, *In re Union Pacific Railroad Employment Practices Litigation*, 479 F.3d 936, 942 (8th Cir. 2007) (holding that contraception exclusion did not violate Title VII). To clarify the issue, the New York Legislature passed the Women's Health and Wellness Act, confirming that

employers in the state are required to cover contraception. *See* N.Y. Ins. Law §§ 3221(l)(16), 4303(cc) (upheld by *Cath. Charities of Diocese of Albany v. Serio*, 7 N.Y.3d 510, 512 (2006) (finding the state had a "substantial interest in fostering equality between the sexes, and in providing women with better health care.").[3]

In passing Section 203-e, the New York Legislature was solving a similar problem: notwithstanding New York and federal antidiscrimination protections, employers continued to discriminate based on aspects of employees' reproductive health decision making that were not explicitly enumerated in existing law. Section 203-e covers an employee's (or their dependent's) decision to become pregnant, use contraception, continue a pregnancy, access prenatal care, obtain an abortion, seek testing or treatment for sexually transmitted infections, undergo *in vitro* fertilization ("IVF"), or use other assistive reproductive technologies. *See* N.Y. Labor Law § 203-e(2)(a) (prohibiting discrimination based on an "employee's or dependent's reproductive health decision making, including, but not limited to, a

---

[3] Several years after New York addressed this issue, Congress did the same when it passed the Women's Health Amendment to the Patient Protection and Affordable Care Act. That 2010 law empowered the federal Health Resources and Services Administration to designate additional preventative care and screenings specifically for women to be covered with no cost-sharing. Women's Health Amendment. S. Amdt. 2791 to S. Amdt. 2786 to the Patient Protection and Affordable Care Act, H.R. 3590, 111th Cong. (2009). One of the goals of the amendment was to ensure contraceptive coverage nationwide with an explicit mandate, whether provided by the employer or by the government. *See* 155 Cong. Rec. S12,051 (daily ed. Dec. 1, 2009) (Statement of Sen. Franken).

decision to use or access a particular drug, device or medical service").

Prior to the passage of Section 203-e, employees encouraged—and, indeed, the EEOC adopted—interpretations of existing law that would protect against discrimination based on reproductive health decision making, *see Enforcement Guidance on Pregnancy Discrimination and Related Issues*, EEOC-CVG-2015-1, 29 CFR 1604 (Equal Employment Opportunities Comm'n, June 25, 2015) (interpreting Title VII to protect an employee's decision to have or not to have an abortion), but—as with pregnancy and contraception coverage disputes in the past—without explicit language in the statute, certain employers continued to push back. As described in Part II, *infra*, the sorts of discrimination Section 203-e prohibits persisted in New York State and nationwide as the Legislature considered Section 203-e. Since Section 203-e's passage, the state's employees can be assured that discrimination based on their reproductive health decision making is explicitly proscribed in New York.[4]

---

[4] Section 203-e also ensures that employees at smaller businesses can rely on the same protections as employees at larger companies. Regardless of any broad interpretation of Title VII, that law's coverage is limited to employers with 15 or more employees. *See e.g.*, *McGowan v. Ananas Spa E*., LLC, No. 09CV0040(JS)(WDW), 2009 WL 2883065 (E.D.N.Y. Sept. 2, 2009) (pregnancy-related discrimination complaint dependent on plaintiff's ability to establish defendant's employment of 15 or more employees).

II.     **EMPLOYEES CONTINUE TO FACE SERIOUS RISK OF WORKPLACE DISCRIMINATION BASED ON THEIR REPRODUCTIVE HEALTH DECISIONS.**

Section 203-e makes clear that employers in this state may not force employees to choose between their jobs and their reproductive health and autonomy. While Plaintiffs-Appellants suggest there was "no actual problem to be addressed" by the bill's passage, Pls. Br. at 59, in fact employers have often exerted their influence over employees' private health care decisions through coercive means such as punishment, threats, or termination. And, as the State Defendants point out, the New York State Legislature plainly noted this ongoing problem when they considered and passed the statute. *See* Defs. Br. at 6.

During the Legislature's debate over Section 203-e, Assembly Member Ellen Jaffee explained that she had received many complaints from constituents about workplace discrimination based on reproductive health decision making. *Id.* (quoting N.Y. Assembly Debate on Assembly Bill No. 8769-A, June 18, 2014, at 106-07).[5] While Assembly Member Jaffee had reasonably been "asked not to share" the details of her constituents' private medical histories, *id.*, public reporting and detailed studies have elucidated the types of discrimination to which Assembly Member Jaffee referred, *see* Stephanie Bornstein, *Poor, Pregnant, And Fired:*

---

[5] Assembly Bill No. 8769-A was a predecessor bill to the bill that became Section 203-e.

10

*Caregiver Discrimination Against Low-Wage Workers*, CENTER FOR WORKLIFE LAW, 11-13 (2011); Joan C. Williams, Professor of Law, Univ. of Cal. Hastings, and Director, Ctr. for Worklife Law, *Written Testimony at EEOC Meeting on Unlawful Discrimination Against Pregnant Workers and Workers with Caregiving Responsibilities* (Feb. 15, 2012); Deborah A. Widiss, Intimate Liberties and Antidiscrimination Law, 97 B.U. L. Rev. 2083 (2017). Culled from those studies— as well as from additional reports, investigations and complaints—the stories below illustrate the types of harm the New York State Legislature acted to address and the types of discrimination prohibited by Section 203-e that persisted in workplaces across the state and country in recent years.

For example, employees who became pregnant and decided to continue the pregnancy still risked being fired from their jobs, demoted, or relieved of key responsibilities, despite the PDA's protections.[6] Kristina McGowan, a receptionist at a day spa on Long Island, told her supervisor she was pregnant one morning. By noon, the spa owner fired her, saying her pregnancy would make her "less agile" and more absent during busy summer months.[7] Leigh Castergine, a former top ticket sales executive for the New York Mets, was fired when the team's chief

---

[6] *See supra* n.4 for a discussion of the PDA's coverage limitations based on number of employees.

[7] Complaint, No. 209CV00040, *McGowan v. Ananas Day Spa et al.*, 2009 WL 3290324 (E.D.N.Y., January 6, 2009).

11

operating officer discovered that she had decided to continue a pregnancy outside of marriage. The COO stated that he was "as morally opposed to putting an e-cigarette sign in my ballpark as I am to Leigh having this baby without being married."[8]

Other employers, especially in low wage workplaces, explicitly forced employees to decide between having an abortion or losing their jobs. For example, after disclosing she was pregnant, Abigail Shomo, a waitress, was told to either have an abortion or face termination. When she refused, the restaurant owner fired her and said that customers preferred to be served by a slim waitress, not someone with a "belly."[9]

By contrast, some employers punished employees who chose to end a pregnancy. Elena DeJesus, a teller at a credit union, asked her supervisor for one day off to have an abortion. Her supervisor approved the request, and Elena proceeded with her abortion. Two weeks later, the credit union's branch manager notified Elena that she was being terminated for her absence from work because

---

[8] Richard Sandomir, *Ex-Mets Executive Sues Jeff Wilpon, Citing Discrimination Over Pregnancy*, N.Y. TIMES, Sept. 10, 2014, https://www.nytimes.com/2014/09/11/sports/baseball/former-executive-sues-mets-and-wilpon-for-discrimination.html.
[9] *Shomo v. Junior Corp.*, No. 7:11-CV-508, 2012 WL 2401978, at *1 (W.D. Va. June 1, 2012).

the medical procedure "was not an appropriate excuse for her absence."[10]

Employers also subjected employees to adverse actions for pursuing pregnancy using assisted reproductive technologies like IVF treatment. Cheryl Hall, a sales secretary, was fired in between her first and second round of IVF treatments. The employee relations manager listed "absenteeism—infertility treatments" as one of the factors relating to Cheryl's job performance. Cheryl's supervisor told her the termination "was in [her] best interest due to [her] health condition."[11]

The stories collected in the reports and studies cited above are only the tip of the iceberg. Many aspects of reproductive health care are stigmatized in the United States—from patients seeking abortions and their health care providers who regularly experience threats, harassment, and violence,[12] to people seeking

---

[10] *DeJesus v. Fla. Cent. Credit Union*, No. 8:17-CV-2502-T-36TGW, 2018 WL 4931817, at *1 (M.D. Fla. Oct. 11, 2018).

[11] *Hall v. Nalco Co.*, 534 F.3d 644, 646 (7th Cir. 2008).

[12] *See generally* Jill Heaviside & Rosann Mariappuram, *The Escalation of Anti-Abortion Violence Ten Years After Dr. George Tiller's Murder*, REWIRE, May 31, 2019, https://rewire.news/article/2019/05/31/the-escalation-of-anti-abortion-violence-ten-years-after-dr-george-tillers-murder/; Violence Statistics & History, NAT'L ABORTION FED., https://prochoice.org/education-and-advocacy/violence/violence-statistics-and-history/ (last visited Oct. 16, 2019); Julia Turkewitz & Jack Healy, *3 Are Dead in Colorado Springs Shootout at Planned Parenthood Center*, N.Y. TIMES, Nov. 27, 2015, https://www.nytimes.com/2015/11/28/us/colorado-planned-parenthood-shooting.html; 2018 NATIONAL CLINIC VIOLENCE SURVEY (Feminist Majority Foundation 2019).

treatment for infertility who seek to avoid stigmatization by keeping their experience secret[13]—and, as a result, instances of discrimination based on reproductive health decision making are likely severely underreported.

At the same time, increasing numbers of New York employers are in the position to identify individual employees through their health insurance claims, *see generally* Tami Luhby, *What does your employer know about your health*, CNN, Feb. 12, 2014, and therefore potentially to use that information to engage in discrimination prohibited by Section 203-e. Over the past several years, New York has required insurance coverage for an expanding universe of reproductive health care, including contraception, N.Y. Ins. Law §§ 3216, 3221, 4303, fertility treatments, N.Y. Ins. Law §§ 3221(k)(6)(C), 4303(s)(3), abortion, 11 NYCRR § 52.16(o), and prenatal care, N.Y. Ins. Law §§ 3216(i)(10), 3221(k)(5), 4303(c), and as a result New York employers may have access to more and more employee information related to those reproductive health decisions.

---

[13] *See generally* Dr. Pragya Agarwal, *Infertility In the Workplace: Women Are Still Suffering In Silence*, FORBES, Mar. 8, 2020, https://www.forbes.com/sites/pragyaagarwaleurope/2020/03/08/infertility-in-the-workplace-women-are-still-suffering-in-silence/?sh=6e5c45762c30; Kelli Thompson, *I Kept My IVF a Secret at Work Because of the Stigma Around Fertility Treatments*, WORKING MOTHER, Mar. 22, 2021, https://www.workingmother.com/how-employers-can-support-employees-with-infertility; Cloe Axelson, *It's Time to End The Stigma Around Infertility. Our Newest Federal Judge Won't Help*, Dec. 11, 2019, WBUR, https://www.wbur.org/cognoscenti/2019/12/11/sarah-pitlyk-surrogacy-infertility-cloe-axelson.

Plaintiffs-Appellants have argued that the New York State Legislature had no reason to pass Section 203-e. But the facts and context identified above tell a different story. The harms experienced by Assembly Member Jaffee's constituents were real, similar harms had been experienced by employees across the country for many years, and the information-sharing threats posed by New York's employment health care coverage scheme were increasing. The Legislature was plainly justified in clarifying the right of New York employees and their dependents to engage in reproductive health decision making free from the scrutiny, control, or retaliation of their employers.

## CONCLUSION

For the reasons set forth above, *amicus curiae* respectfully urges this Court to affirm the district court's order.

Dated: August 25, 2021
New York, N.Y.

Respectfully Submitted,

NEW YORK CIVIL LIBERTIES
    UNION FOUNDATION

BY:

*/s/ Gabriella Larios*
GABRIELLA LARIOS
KATHARINE ES BODDE
ALLISON S. BOHM
ROBERT HODGSON
MOLLY K. BIKLEN
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300
glarios@nyclu.org

*Counsel for Amicus Curiae*

16

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rules of Appellate Procedure 27(d)(2)(A), stating that the total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of citations, and certificate of compliance, is 3,316. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Procedure 32(a)(6) because it has been prepared using 14-point Times New Roman proportionally spaced typeface, double-spaced.

Dated: August 25, 2021
New York, N.Y.

Respectfully Submitted,

By: */s/ Gabriella Larios*
Gabriella Larios

*Counsel for Amicus Curiae*

17